Well, the clerk, please call the next case 324 0574. The people of the state of Illinois versus Deontay are sparks appellant. Council Punjabi. Am I saying that correctly? You are. Thank you. You may proceed. May it please the court. My name's Deepa Punjabi. I represent the appellant Deontay Sparks. Mr. Sparks appeals his convictions for armed robbery, unlawful possession of a weapon and first degree murder, as well as his 56 year sentence. My intention today was to focus on the ineffective assistance argument relating to the firearm and toolmark expert testimony. But of course, I'm also happy to answer any questions that this court may have about the disproportionate penalty sentencing challenge. Mr. Sparks argued that his counsel was ineffective for failing to challenge the firearm identification evidence in this case. Kurt Zelinsky, the state's firearm analyst, testified conclusively that the shotgun shell recovered from the scene of the shooting was fired from a shotgun that was recovered from Mr. Sparks. Counsel, may I interrupt you briefly? Sure. You filed a motion, I believe, for additional authority. I did, your honor. And I believe it was unopposed by counsel. Is that correct? Okay. It has been granted. You may argue that case. Thank you, your honor. Mr. Sparks's trial counsel failed entirely to challenge this firearm evidence in any meaningful way, even though there were several things that counsel should have and could have done. Counsel should have asked for a fry hearing on the evidence. He also should have objected to the admission of Mr. Zelinsky's findings as lacking an adequate foundation. But even if that objection were overruled, certainly counsel here at a minimum had an obligation to cross-examine Mr. Zelinsky so as to educate the jury about the growing controversies concerning the methods used in the field of firearm identification and that such methods are not considered by all to be settled science and do not necessarily result in findings that have scientific certainty attached to them. Now, under the fry standard, expert scientific evidence is admissible only if the method has gained general acceptance in a relevant scientific community. And when we look at this relevant scientific community, you can't confine it just to firearm analysts or the law enforcement community. That's a point that our Supreme Court made in McCown. And in US v. Tibbs, which is a case I cite in my brief, the Superior Court of the District of Columbia noted that, you know, standard of general acceptance is to have any meaning at all. Courts cannot just confine the relevant scientific community only to those whose professional standing and financial livelihoods depend on the challenged discipline. You have to look at a wider academic and scientific community. And here there has been a rising tide of criticism in the wider academic and scientific community about the scientific validity of this discipline. To the extent that this method of firearm and tool mark identification has had general acceptance in the past, that acceptance has really started eroding in recent years, both through scientific publications as well as legal challenges to such evidence. Briefly, you know, in my brief, I cite the 2008-2009 National Research Council of the National Academies of Science report, and these were blue ribbon panels of scientists who were charged with evaluating the empirical foundation of firearm identification. And they found that there was none, that the decision of the tool mark examiner is a subjective decision based on unarticulated standards, and there are no statistical foundations for estimation of error rates. It noted that examiners are not able to specify, for example, how many points of similarity are necessary for a given level of confidence in a result. There simply are no objective standards that govern this field. I'll interrupt you briefly. This was a shotgun shell that was being examined, am I correct? That's correct. Okay, so we don't have rifling, we have smooth barrel. That's correct. So the identifying shot from a smooth barrel seems just inherently nothing based to connect the two, right? So what are you left with in a shotgun shell to identify? Mr. Zelensky testified to certain breech face markings that had marked the casing that led him to conclude that this projectile was fired from that specific firearm. So it was the markings on the shell casing, not the paper, but on the metal. Yes, that's correct. Identifying it with the breech indentations, perhaps, of the shotgun itself, right? Yes, that's correct. I mean, we kind of have to guess. He wasn't very specific. He kind of just said, I looked at the breech face markings and I concluded, conclusively, this came from this firearm. Did he make an opinion as to the primer marking, the striking of the primer to ignite the shell? No, I don't believe so. I think he only mentioned the breech face markings, if my memory serves. So, you know, you have these criticisms saying that these are wholly subjective decisions and that chorus of voices has only grown louder in 2016. Of course, I cite that report from the President's Council of Advisors on Sciences that issued a report expressing similar concerns as the NRC report, and that report noted the need for more black box studies to demonstrate repeatability and error rates. Now, some of those additional studies have been done in the last couple of years, but just last year, an article was published by statisticians, and I cited this in my brief, by statisticians with expertise in how to design scientific experiments, and they concluded that these additional studies still have methodological flaws that are so problematic that they just render the studies invalid and that the scientific validity of this field remains unestablished. And due to these criticisms by the scientific community, courts around the country, mostly in the last five or six years, I'd say, have started to place some pretty significant limitations and restrictions on the kinds of conclusions that firearm examiners can render before a jury. And in the last one or two years, you're even starting to see some courts here and there exclude this kind of testimony altogether due to the lack of reliability and scientific validity. But, you know, even if Mr. Sparks's counsel had not been able to get the firearm identification testimony excluded altogether, he still should have asked for a FRI hearing that might have resulted in some significant limitations on what he could conclude for the jury. For example, in some cases, they've said an examiner can testify to their observations, but they can't make any conclusion that a certain casing was fired from a certain firearm the way that Mr. Zielinski did in this case. If Mr. Zielinski had not been allowed to make any outright conclusions, as in that case, that would have peeled away that veneer of scientific certainty that the jury otherwise would have attached to his testimony. But, you know, even if counsel's request for a FRI hearing had been denied, at a minimum, counsel had a duty through his cross-examination of Mr. Zielinski to educate the jury regarding these controversies and questions that have been repeatedly raised now about the reliability of this field. Counsel was ineffective for failing to cross-examine Mr. Zielinski about these ongoing criticisms by experts who've raised concerns about the failure to calculate error rates or failure to develop criteria for identification that don't rely on subjective visual perceptions. Had counsel confronted Mr. Zielinski with some of it would have cast doubt on Mr. Zielinski's testimony, which was a pretty crucial piece of the state's case. And it's important to note, you know, the state in its brief doesn't really dispute that counsel failed to cross-examine Mr. Zielinski on the majority of concerns that have been raised by scientists about the reliability of this discipline. Instead, the state argues that Mr. Sparks cannot establish Strickland prejudice due to the strength of the state's other evidence. But I take issue with that, particularly with respect to the first degree murder count. This was a case where Mr. Sparks was convicted of armed robbery as a principal offender, but he was convicted of first degree murder on a theory of accountability, which held him liable for the actions of an unidentified principal shooter who stood outside the car and shot at and killed Reginald Harris while Mr. Sparks remained inside the car with Avery Harris. And apart from the mere presence of the unidentified shooter during this offense, there really wasn't any other evidence tying Mr. Sparks to any common design with the principal shooter, except for the firearm identification evidence in this case. The primary piece or certainly an important part of the evidence in this case that tied Mr. Sparks to the shooter and the shooting itself was Kurt Zielinski's testimony that the casing found on the scene of the offense was fired from a gun found in Mr. Sparks's bedroom. Had that testimony been excluded or even significantly limited or discredited through cross-examination, the case against Mr. Sparks with respect to the first degree murder count would have been much weaker. And that is all that is needed to establish Strickland prejudice. We don't have to show conclusively that there would have been a different outcome absent counsel's error. We only have to show that there would have been a reasonable probability of one. And I think you can find that here where this evidence was an important part of the state's case connecting Mr. Sparks to the shooting. I also wanted to spend a few moments discussing counsel's failure to challenge the foundation for Mr. Zielinski's testimony. Yes, was there a question? Oh, I'm sorry. So the state urges this court to rely on people v. Simmons in arguing that there was an adequate foundation for Mr. Zielinski's testimony. And that was a case where the fire, it was sort of similar to this case, the firearm examiner, basically they went through, you know, they went through for the jury, how we look at class characteristics and individual characteristics. And he testified that he looked through a comparison microscope at the markings on the two bullets and concluded that they were fired from the same firearm. And the second district in that case stated that, you know, this testimony was pretty sparse, but that it was nevertheless sufficient to lay an foundation. But I think Simmons has questionable validity. After our Supreme Court's decision and people v. Murray a few years later, Murray held that our rules of evidence unambiguously require that an expert articulate the reasons for his opinion. And it noted that, you know, an expert's not required to testify to all of the underlying facts and data under the rule before giving an but they do still have to give reasons for the opinion and can't just provide a summary conclusion. And that's basically what Mr. Zielinski did here. He just stated that he looked at the breach face markings and concluded the casing was fired from the firearm that the police recovered. And I would submit that under our Supreme Court's decision and Murray and their interpretation of the rules, that that does not suffice. But I'd also note that in Simmons, Defense Counsel cross-examined the expert thoroughly. So the expert there then had to limit the scope of his opinion and specifically stated or was forced to state on cross-examination that he could not offer an opinion that the bullets were fired from the same firearm to the exclusion of other firearms. So Simmons really does not help the state's case. Even if you do find an adequate foundation was laid, you'd still have to find counsel ineffective for failing to cross-examine Mr. Zielinski in the way that the counsel did in Simmons. Were there any questions that I could answer for this court? Included your argument? I'm sorry? Are you concluding your argument? I'm concluding. I respectfully request you reverse and remand for a new trial pursuant to argument one or reduce the sentence or remand for a new sentencing hearing pursuant to argument two. Okay. Thank you. Any questions from the bench? I do not. No? Okay. Thank you, counsel. You'll have time in reply. Thank you. Mr. Nicolosi, you may respond. Thank you. Good afternoon, your honors. May it please the court. Ms. Punjabi, my name is Justin Nicolosi. I represent the state of Illinois in this case. The state respectfully requests this court affirm the defendant's convictions and sentence. Just as my opposing counsel did, I will focus on issue one of the ineffective assistance related to Kurt Zielinski's testimony. If the court has any questions about the sentencing aspect of this, I'd be happy to answer those questions also. Again, the state submits that this court should reject any claim that defense counsel was ineffective regarding Kurt Zielinski's testimony. What opposing counsel did not mention was, of course, the cases from this state, the 2013 case Robinson and the 2018 case Rodriguez that has very thoroughly went over firemark and firearm and toolmark analysis, the science behind it, the fact that it's been well established in this case as reliable, generally accepted science. Those cases are, of course, still good law. As I cite in my brief, there are... Have you broken down those cases by the type of firearm? I'm sorry, say that again, your honor. You say, oh, we got all these cases, it's well accepted. I mean, have they segregated these cases into the type of firearm that they're doing these analysis on? I don't believe so, your honor. Not that I am specifically aware of, no. Wouldn't that be useful? Well, your honor, I think the methods regarding any type of firearm, I think that's what we're talking. We're talking about whether a fry hearing is needed or whether there's a foundation. I think the methodology regarding toolmark analysis, firearm analysis is what's important. Zielinski testified that he first went into voir dire whether or not he was an expert, talked about all his education, his training, what he's looking for, class characteristics, individual characteristics, that he's done thousands of these types of analyses. And based on that, he was granted expert status. I don't think it matters. He's testifying to methodology for matching at a higher level of analysis, right? Correct, correct. And he's giving methodology, and that methodology should meet some scientific research standards, am I correct? Absolutely. Well, I'm asking a question about the subject to the identification. Is it maybe less likely to be credible with one type of firearm as opposed to another? I would think maybe with a firearm that's all brass or all metal, that there may be more markings around the outside, as you discussed with Mr. Jabi, that a shotgun shell might be different based on the paper. But I think the fact that the back of the breech face is what Mr. Zielinski- Correct me if I'm wrong, if it's a cartridge, rifling inside the barrel, comparisons usually are rifling of the lead bullet with the rifling in the barrel. Now, you don't have that with shotguns. No. So really, what are you really comparing? And I think opposing counsel said, well, he was comparing the markings in the breech against the brass of a shotgun shell. Okay? Yes. So what's the database that establishes probability for those markings in shotgun shells? Well, Your Honor, I don't know if there's any specific information about that. Like you said, I don't think Rodriguez and Robinson, these other cases necessarily go into the distinct types of ammunition. That's not an aspect I thought to research. I don't believe opposing counsel researched that specific element. I'm sorry. Suggesting that ineffective assistance of counsel was shown by not asking the questions I just asked. Well, I thought, yes, yeah. With regards to the specific markings that led to Mr. Zielinski forming his opinion, yes, that's correct. But that's why I rely heavily on the case of Simmons from 2016, which is still good law. That case, I think, is remarkably similar to this case. The court in that case referred to the expert, the forensic scientist, whose name was Maland. His testimony was sparse in that case, but the court, nevertheless, based on the science and the foundation and the fact that this has been a well-established, generally accepted science, supporting the testimony that was not required. He gave the specific reasons, the specific marks he wasn't required to show on a PowerPoint, let's say, that these marks were identical. The fact that he was an expert and his expertise, his training, gave him the ability to opine that the fired ammunition matched the test ammunition. And that's what we have in this case as well. Yeah, the state concedes that there was, I've mentioned in the briefcase, there were no specifics of what Zielinski was looking at here. But again, the fact that this is an accepted science, he was deemed an expert. Counsel basically didn't even object to his admission as an expert. In this case, based on Simmons, the state admits that's sufficient and it's still the law. Based on that, yeah, your honor, I understand the difference between ammunition, but I don't believe that was an avenue that we really went into in this case, however. But the fact that Zielinski testified that he made test fires, compared them to the shotgun shell casing that was found at the scene of the crime here, based on marks on the briefcase, he was able to conclude that the shotgun found fired from the shotgun that was recovered from his bedroom. You know, talking about whether or not counsel was provided efficient performance or his inability to cross-examine Zielinski about the criticism. Again, it concedes that the counsel did not cross-examine or regard the reports that the defense cites in the brief. Those reports, of course, again, have been not new or novel. They were around for Riguez and Robinson. Those criticisms have been acknowledged over and over. Again, they weren't brought up in cross, but if this court finds deficient performance for the inability to present those criticisms to Zielinski, the state submits that the evidence in this case is overwhelming and that no prejudice was had by defendant. Again, even if Zielinski's testimony was limited, as a lot of courts in other jurisdictions have limited testimony from firearm examiners, limited to stopping short of conclusively saying that this found shell was found, was fired from this particular firearm, that remains. We still have a shotgun that was surely capable of firing the shell that was found around 17th Sierra. In this case, other ammunition found in defendant's bedroom matched the class characteristics of the shotgun shell that was seen. That's undeniable physical evidence. Of course, we have Avery Harris, the surviving victim of this attack, was hidden in the head with a gun by the defendant. He identified the defendant. He set up numerous transactions with the defendant as the text message admitted in this case established. The defendant's girlfriend or ex-girlfriend gave him a particular phone that Avery Harris communicated with. There's no question that it was defendant in the backseat of that car that night. His DNA was on the door handle of the rear passenger seat. Counsel suggested that there was nothing to tie the defendant who was in the backseat with the unnamed, unidentified shooter that was outside. I understand that's technically true, does anybody possibly believe that these are two independent assailants? We can't possibly believe that. The fact that a shotgun was found in the defendant's bedroom with class ammunition blows that theory up. The state just submits. There's overwhelming evidence that the defendant was accountable and knew this was all part of a common scheme to rob Avery and unfortunately ended Reginald Harris's life. But here's where we are and the state submits that based on the arguments in my brief and my arguments here today, that this court should bring back to the defendants' attentions of ineffective assistance and the defendants' convictions. If there are any other questions. Any questions from the bench? I do not. Okay. Thank you, counsel. Counsel, you may reply. Thank you. My opposing counsel here such as Robinson and Rodriguez to argue that Illinois courts have consistently admitted this kind of evidence in the past and as such, this is a method that does enjoy general acceptance and this is a settled matter. But it certainly can't be the case that if the scientific community subsequently disavows a certain method as junk science or is not based on any objective or scientific standards, it can't be the case that courts are now just stuck with this method and have to keep admitting it because it used to be accepted in the past. And the cases that the states points to, such as Robinson and Rodriguez, which came out in 2013 and 2018, those cases were decided before you really started seeing this surge in the last five or six years of judicial opinions limiting what a firearm examiner can say or even excluding it altogether in response to this rising tide of scientific criticism. And since then, that group of professional scientific voices criticizing this field, since those cases were decided, that has only grown stronger. Rodriguez was decided in 2018. Since then, as I stated before, additional black box studies have been attempted to try to support the validity of this field, but those studies have been debunked as scientifically invalid. So I acknowledge the past case law that has declined to hold that a FRI hearing should be conducted on this kind of evidence, but I think it is time to revisit the question of whether this method of firearm identification continues to enjoy general acceptance by the scientific community. I would say- Excuse me. What about the argument that it wouldn't have made a difference in this case? I mean, there was DNA that put him in the car. There's a cell phone GPS data that put him there. There's cell phone, I think it was texting or calls that put him there. He had the same kind of weapon in his room with the same kind of ammunition. Why would any of this make a difference? Yes, your honor. Thank you for that question. I think a lot of that evidence goes to the armed robbery count, that there's no question that he was in that car, that they had conducted prior drug transactions. But I think where you really see some Strickland prejudice is on that first degree murder count, and I guess it would also pertain to unlawful possession of the shotgun. Mr. Zielinski's testimony that the casing found on the scene was fired from a gun found in Mr. Sparks' bedroom, this was undeniably an important part of the state's case connecting Mr. Sparks to the shooting. And had that testimony been excluded or discredited, the case against Mr. Sparks, at least with respect to the first degree murder count, would have been undeniably weaker. That suffices to create, this is not a sufficiency of the evidence argument, right? So this suffices to create a reasonable probability of a different outcome. And remember, we don't have to show that there definitely would have been a different outcome absent counsel's error. We only have to show that there would have been a reasonable probability of one, and that reasonable probability courts have held can be even less than a 50% chance of a different outcome. And here, where the evidence at issue was an important part of the state's case connecting Mr. Sparks to the shooting, there is sufficient prejudice resulting from counsel's failure to challenge this evidence to constitute Strickland prejudice. Were there other questions from this board that I could answer? No. Okay. Well, thank you, counsel, for your arguments in this matter this afternoon, both counsel. This matter will be taken under advisement. A written disposition shall issue. And at this time, the clerk of our court will escort you out of our remote courtroom and will proceed on to the next cases. Thank you. Thank you.